UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------------ X

JOSE DEL-ORDEN, on behalf of himself and all others
similarly situated,

                                        Plaintiff,

                        -v-

BONOBOS, INC.,

                                        Defendant.

------------------------------------------------------------------ X

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: 12/20/17

17 Civ. 2744 (PAE)

OPINION & ORDER

PAUL A. ENGELMAYER, District Judge:

This case is a putative class action by a legally blind plaintiff claiming that the website of Bonobos, Inc. ("Bonobos"), an establishment that sells clothing and accessories, including through its website, is not compliant with the Americans with Disabilities Act (the "ADA"), because the website denies equal access to blind customers. Bonobos now moves to dismiss the first amended complaint ("FAC") of named plaintiff Jose Del-Orden ("Del-Orden"). Bonobos argues that the ADA does not apply to commercial websites. And, Bonobos argues, even if the ADA does apply, the FAC fails to state a live ADA claim, because that claim seeks only injunctive relief, and Bonobos contends that, by the time the FAC was filed, it had remedied its website to cure the access barriers of which the FAC complains, leaving no unlawful conduct to enjoin.

For the reasons that follow, the Court denies Bonobos' motion. The Court today joins the growing number of courts to hold that commercial websites qualify as "public accommodations" within the meaning of the ADA, such that the ADA's protections extend to blind persons who claim discriminatory access to such websites. And, as explained below, the Court cannot hold,

1

on Bonobos' motion to dismiss, that the Bonobos website is today compliant with the ADA—

*i.e.*, that all material deficiencies cited in the FAC have been cured so as to moot Del-Orden's bid

for injunctive relief under the ADA.  The Court therefore denies Bonobos' motion to dismiss.

The case will now proceed to discovery.

## I.      Background[1]

### A.      The Parties

Del-Orden, who is legally blind, cannot use a computer without the assistance of a

screen-reader, a piece of software that allows the visually impaired to access information on a

computer screen.  FAC ¶¶ 17, 38.  Such software "vocalizes visual information on a computer

screen." *Id.* ¶ 38.

---

[1] The Court draws these facts principally from the FAC, Dkt. 17, the attached exhibits, and the documents incorporated therein by reference.  The Court accepts as true all factual allegations in the FAC, drawing all reasonable inferences in Del-Orden's favor. *See Koch v. Christie's Int'l PLC*, 699 F.3d 141, 145 (2d Cir. 2012).  "In considering a motion to dismiss for failure to state a claim pursuant to Rule 12(b)(6), a district court may consider the facts alleged in the complaint, documents attached to the complaint as exhibits, and documents incorporated by reference in the complaint." *See DiFolco v. MSNBC Cable LLC*, 622 F.3d 104, 111 (2d Cir. 2010).  By the same measure, where, as here, the Rule 12(b)(1) motion is "facial"—that is, "based solely on the allegations of the complaint or the complaint and exhibits attached to it," *Carter v. HealthPort Techs., LLC*, 822 F.3d 47, 56–57 (2d Cir. 2016)—the Court may properly consider the documents incorporated by reference within the complaint, *see Atl. Recording Corp. v. Project Playlist, Inc.*, 603 F. Supp. 2d 690, 694 n.3 (S.D.N.Y. 2009) (Chin, *J.*).  Here, Bonobos' Rule 12(b)(1) motion is based on the claim that the FAC's claim for injunctive relief has been mooted by modifications to Bonobos' website.  The Court therefore has considered, as an item cognizable on Bonobos' motion, the website Bonobos.com in its present configuration, in addition to the exhibits and affidavits attached to the parties' submissions on this motion. *See, e.g., Atl. Recording Corp*, 603 F. Supp. 2d at 694 n.3 ("Because the Website is incorporated by reference into the Complaint, the Court may consider it on a motion to dismiss."); *Orozco v. Fresh Direct, LLC*, No. 15-CV-8226 (VEC), 2016 WL 5416510, at *1 n.1 (S.D.N.Y. Sept. 27, 2016) (same); *Gorran v. Atkins Nutritionals, Inc.*, 464 F. Supp. 2d 315, 319 n. 1 (S.D.N.Y. 2006) (same); *Knievel v. ESPN, Inc.*, 223 F. Supp. 2d 1173, 1176 (same).

Bonobos is a retailer of clothing, shoes, golf gear, and accessories. *Id.* ¶ 19. Bonobos operates through the website Bonobos.com, as well as through 38 brick-and-mortar stores in the United States. *Id.*

**B.      The Initial Complaint and Bonobos' Motion to Dismiss**

On April 17, 2017, Del-Orden filed a Complaint in this Court against Bonobos. It alleged that Del-Orden had attempted on various occasions—most recently earlier in April 2017—to complete a transaction on Bonobos' website, but that he had been prevented from doing so by various features of the website that presented access barriers to blind consumers. Dkt. 1 ("Compl.") ¶¶ 48–49. The Complaint alleged that Bonobos had willfully put these barriers in place and that they violated the ADA. *Id.* ¶ 52. As relief under the ADA, the Complaint sought injunctive relief and reasonable attorneys' fees. *Id.* ¶¶ 67–68. In separate claims under the New York State and City Human Rights Laws, the Complaint also sought compensatory damages. *Id.* ¶¶ 70–84, 85–97, 98–109.

On June 30, 2017, Bonobos moved to dismiss on various grounds. *See* Dkt. 11 (motion to dismiss); Dkt. 12 (memorandum of law) ("Bonobos Mem."). These included that Bonobos' website was not covered by the ADA because privately owned commercial websites do not qualify as places of "public accommodation" within the statute's meaning. Bonobos further argued that even if the ADA applies to such websites, Bonobos' website is today "compliant with most commercially available screen-reading software" and therefore can be used by blind customers. Bonobos Mem. at 2–3. Therefore, Bonobos argued, Del-Orden's claim for injunctive relief—the sole relief available under his federal claim, under the ADA—was both moot and substantively deficient, and the case should therefore be dismissed for lack of subject matter jurisdiction and for failure to state a claim. *Id.* at 24.

3

### C.    The FAC

On July 20, 2017, Del-Orden filed the FAC.[2]  Dkt. 17.   Again bringing a claim under the ADA and claims under state and city law, the FAC added the allegation that in July 2017, Del-Orden had again visited the Bonobos website, and, as in April 2017, had been unable, due to his blindness, to make an online purchase.  FAC ¶ 17.  Del-Orden, the FAC alleged, remained unable to "select the desired fit and type of clothes" and to "mak[e] purchases on Bonobos.com." *Id.* ¶ 43.  In particular, it alleged, Del-Orden was unable to specify a collar type when attempting to purchase a customizable shirt.  *Id.* ¶ 46.  To do so, the FAC alleged, required use of a computer mouse, which Del-Orden is unable to use.  *Id.*  Because Bonobos.com is inaccessible to him, the FAC alleged, Del-Orden may access Bonobos only at one of its brick-and-mortar locations.  *Id.* ¶ 47.  But, the FAC alleged, because of access barriers on the website, Del-Orden "was unable to find the location of a physical store location on [Bonobos'] website, preventing him from going into a physical store to complete a purchase with the help of Bonobos' employees."  *Id.* ¶ 49.

### D.    The Motion to Dismiss

On July 25, 2017, the Court held an initial pre-trial conference, set a briefing schedule for Bonobos' anticipated motion to dismiss the FAC, and stayed discovery pending resolution of the motion to dismiss.  *See* Dkt. 20.  On August 11, 2017, Bonobos filed its motion to dismiss.  Dkts.

---

[2] On July 6, 2017, following Bonobos' motion to dismiss, the Court had issued an amend-or-oppose order, directing Del-Orden, by July 21, 2017, to file either an amended complaint or a brief in opposition to the motion to dismiss.  Dkt. 15.

21–23 ("Def. Br."). On September 1, 2017, Del-Orden filed a brief in opposition, Dkt. 24 ("Pl. Br."), and on September 15, Bonobos filed a reply, Dkt. 25 ("Def. R. Br.").[3]

## II.    Discussion

Bonobos' motion to dismiss principally raises two issues. The first is whether the ADA applies to private commercial websites, *i.e.*, whether such websites are "public accommodations" within the meaning of the statute. Bonobos argues that the ADA does not so apply, and therefore that the FAC cannot state a federal claim. The second is whether, even if the ADA can apply in principle to such websites, the FAC—and the materials cognizable on this motion, including the Bonobos.com website itself—allege an ongoing violation of the ADA.[4] Bonobos argues that it does not: It represents that, after the filing of Del-Orden's initial complaint, it made modifications improving the accessibility of its website and that a review of the website reveals that it is today accessible to blind users by the standards commonly used to assess such accessibility. Bonobos argues that injunctive relief is thus not available and that, because the ADA does not provide for compensatory damages, Del-Orden's sole federal claim for relief is moot. Bonobos therefore contends that the ADA claim must be dismissed, either for want of subject matter jurisdiction under Federal Rule of Civil Procedure 12(b)(1), or for failure to state a

---

[3] On October 3, 2017, after briefing on the motion to dismiss was complete, Del-Orden filed the Declaration of Michael McCaffrey (the "McCaffrey Declaration") in support of his opposition to the motion to dismiss. Dkt. 27. On October 6, 2017, Bonobos submitted a letter asking that this declaration be struck as an untimely and unauthorized sur-reply. Dkt. 28. On October 9, 2017, Del-Orden responded, explaining that he had submitted the declaration to explain a "website compliance audit" of Bonobos.com, which Del-Orden had referenced in his opposition brief and whose authorship and validity Bonobos had questioned in its reply. Dkt. 29. On October 10, 2017, the Court issued an order stating that it would reserve judgment on the propriety of the McCaffrey Declaration and resolve that issue when it resolved the motion to dismiss. Dkt. 30.

[4] Bonobos argues, and Del-Orden does not dispute, that Bonobos.com is incorporated by reference in the FAC, and thus properly before the Court on a motion to dismiss under both Rule 12(b)(1) and Rule 12(b)(6). *See* Def. Br. at 6–8.

claim under Federal Rule of Civil Procedure 12(b)(6). Further, Bonobos argues, the FAC's remaining claims under state and city law, which are before the Court only as pendent to the ADA claim, must be dismissed for lack of federal jurisdiction.

The Court addresses these arguments in sequence, after first reviewing the standards governing motions under Rules 12(b)(1) and 12(b)(6).

### A.    Applicable Legal Standards

#### 1.    Rule 12(b)(1)

A claim is "properly dismissed for lack of subject matter jurisdiction under Rule 12(b)(1) when the district court lacks the statutory or constitutional power to adjudicate it." *Makarova v. United States*, 201 F.3d 110, 113 (2d Cir. 2000). Because "Article III, § 2, of the Constitution limits the jurisdiction of federal courts to 'Cases' and 'Controversies,'" "an actual controversy must be extant at all stages of review." *Genesis Healthcare Corp. v. Symczyk*, 569 U.S. 66, 71 (2013) (citation omitted). "If an intervening circumstance deprives the plaintiff of a personal stake in the outcome of the lawsuit, at any point during litigation, the action can no longer proceed and must be dismissed as moot." *Id.* at 72. (citation omitted).

"A plaintiff asserting subject matter jurisdiction has the burden of proving by a preponderance of the evidence that jurisdiction exists." *Giammatteo v. Newton*, 452 Fed. App'x. 24, 27 (2d Cir. 2011) (citing *Makarova*, 201 F.3d at 113). In resolving a motion to dismiss for lack of subject matter jurisdiction, "the court must take all facts alleged in the complaint as true and draw all reasonable inferences in favor of plaintiff," *Natural Res. Def. Council v. Johnson*, 461 F.3d 164, 171 (2d Cir. 2006) (internal quotation omitted), but "jurisdiction must be shown affirmatively, and that showing is not made by drawing from the pleadings inferences favorable to the party asserting it," *Shipping Fin. Servs. Corp. v. Drakos*, 140 F.3d 129, 131 (2d Cir. 1998);

*see also APWU v. Potter*, 343 F.3d 619, 623 (2d Cir. 2003); *Amidax Trading Group v. S.W.I.F.T.*

*SCRL*, 671 F.3d 140, 145 (2d Cir. 2011).  On such a motion, a court may consider evidence

outside the pleadings, such as affidavits and exhibits. *See Makarova*, 201 F.3d at 113.

Where a defendant moves to dismiss a claim for injunctive relief claiming mootness due

to its post-litigation corrective measures, "'factual changes made by a defendant after litigation

has commenced cannot render a case moot unless it is absolutely clear the defendant cannot

resume the allegedly offending conduct.'" *Clear Channel Outdoor, Inc. v. City of New York*, 594

F.3d 94, 110 (2d Cir. 2010) (quoting *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs., Inc.*, 528

U.S. 167, 189 (2000)).  But, "[t]he voluntary cessation of allegedly illegal activity may render a

case moot 'if the defendant can demonstrate that (1) there is no reasonable expectation that the

alleged violation will recur and (2) interim relief or events have completely and irrevocably

eradicated the effects of the alleged violation.'" *Id.* (quoting *Campbell v. Greisberger*, 80 F.3d

703, 706 (2d Cir. 1996)).

### 2.    Rule 12(b)(6)

To survive a motion to dismiss under Rule 12(b)(6), a complaint must plead "enough

facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S.

544, 570 (2007).  A claim will only have "facial plausibility when the plaintiff pleads factual

content that allows the court to draw the reasonable inference that the defendant is liable for the

misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 663 (2009).  A complaint is properly

dismissed, where, as a matter of law, "the allegations in a complaint, however true, could not

raise a claim of entitlement to relief." *Twombly*, 550 U.S. at 558.  Accordingly, a district court

must accept as true all well-pleaded factual allegations in the complaint, and draw all inferences

in the plaintiff's favor. *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir.

2007). However, that tenet "is inapplicable to legal conclusions." *Iqbal*, 556 U.S. at 678.  A pleading that offers only "labels and conclusions" or "a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555.

## B.      Does the ADA Cover Private Commercial Websites Like Bonobos.com?

The Court begins its analysis by addressing the overarching threshold issue:  Does Title III of the ADA, which prohibits discrimination by "public accommodations,"[5] extend to a private commercial website like Bonobos.com?  The Court agrees with Bonobos that whether the ADA applies to such a website is an open question in the Second Circuit.  However, the Court is persuaded by various authorities—including an instructive Second Circuit decision applying the ADA to insurance services, decisions of district courts in this Circuit, and the decisions of other circuit courts of appeal—that the ADA applies to commercial websites in general.  The Court is further persuaded that, even if this were not so, the ADA clearly applies to private commercial websites which (as here) operate in tandem with the merchant's conventional (*i.e.,* brick and mortar) places of public accommodation.

### 1.      The Second Circuit's *Pallozzi* Decision

The Second Circuit has not addressed whether the ADA's prohibition on discrimination in places of "public accommodation" extends to "places" on the Internet or to the online services of real-world public accommodations.  A closely analogous Second Circuit decision, however, strongly suggests that it does.  In *Pallozzi v. Allstate Life Insurance Co.*, 198 F.3d 28 (2d Cir. 1999), *opinion amended on denial of reh'g*, 204 F.3d 392 (2d Cir. 2000), the Circuit held that

---

[5] The "ADA forbids discrimination against disabled individuals in major areas of public life, among them employment (Title I of the Act), public services (Title II), and public accommodations (Title III)."  *PGA Tour, Inc. v. Martin*, 532 U.S. 661, 675 (2001).  Only Title III, applicable to public accommodations, is at issue here.

Title III of the ADA regulates insurance underwriting practices, regardless of where that underwriting takes place. The Court began "with the fact that Title III specifies an 'insurance office' as a 'public accommodation.'" *Id.* at 31. Title III, the Court noted, prohibits such a place from "discriminat[ing] against [an individual] on the basis of disability in the full and equal enjoyment of [its] *goods* [and] *services.*" *Id.* (emphasis and alterations in original) (quoting 42 U.S.C. §§ 12181(7)(F), 12182(a)). The Circuit wrote: "The most conspicuous 'goods' and 'services' provided by an 'insurance office' are insurance policies. Thus, the prohibition imposed on a place of public accommodation from discriminating against a disabled customer in the enjoyment of its goods and services appears to prohibit an insurance office from discriminatorily refusing to offer its policies to disabled persons." *Id.* (citing *Doe v. Mutual of Omaha Ins. Co.*, 179 F.3d 557, 559 (7th Cir. 1999)).

Significant here, the Second Circuit in *Pallozzi* rejected the insurer's contention that the ADA applies only to "insurance *offices*," *i.e.*, the claim that Title III guarantees only "physical access to the facilities of insurance providers," but does not "prohibit discrimination against the disabled in insurance underwriting." *Id.* at 32. The Circuit found that argument "unpersuasive," explaining that:

> Title III's mandate that the disabled be accorded "full and equal enjoyment of the goods, [and] services . . . of any place of public accommodation," suggests to us that the statute was meant to guarantee them more than mere physical access.

*Id.* The Circuit also drew significance from that statutory text, noting that Congress had chosen to guarantee access to goods and services "*of* any place of public accommodation," rather than "*in*" such a place. It explained: "The term 'of' generally does not mean 'in,' and there is no indication that Congress intended to employ the term in such an unorthodox manner in Section 302(a) of Title III." *Id.* at 33. The Circuit also noted that "many of the private entities that Title

9

III defines as 'public accommodations'—such as a 'bakery, grocery store, clothing store, hardware store, [or] shopping center,' as well as a 'travel service, . . . gas station, office of an accountant or lawyer, [or] pharmacy,' sell goods and services that are ordinarily used outside the premises." *Id.* It would make little sense, the Circuit reasoned, to limit Title III's scope to discrimination in the provision of goods or services literally consumed *in* a place of public accommodation. *Id.*

### 2.    **District Court Decisions Applying *Pallozzi* to Websites**

Since *Pallozzi,* the four district courts in this Circuit to address the issue have each held, drawing on that decision, that Title III extends to online fora offering goods and services. In *National Federation of the Blind v. Scribd Inc.*, 97 F. Supp. 3d 565 (D. Vt. 2015), the court held that Title III applied to a digital library subscription service, Scribd, accessible only via the Internet. *Id.* at 567. In *Markett v. Five Guys Enterprises LLC*, No. 17-CV-788 (KBF), 2017 WL 5054568 (S.D.N.Y. July 21, 2017), Judge Forrest held that a fast food restaurant's website, Fiveguys.com, was "covered under the ADA, either as its own place of public accommodation or as a result of its close relationship as a service of defendant's restaurants, which indisputably are public accommodations under the statute." *Id.* at *2. More recently and comprehensively, in *Andrews v. Blick Art Materials, LLC*, No. 17-CV-767, 2017 WL 3278898 (E.D.N.Y. Aug. 1, 2017), Judge Weinstein held that Title III applied to a website run by a company, Blick Art Materials, even absent a connection to Blick's brick-and-mortar stores. *Id.* at *8. After carefully canvassing the applicable authorities, Judge Weinstein held that Title III prohibited Blick "from discriminating against the blind by failing to take the steps necessary to ensure that the blind have 'full and equal enjoyment' of the goods, services, privileges, advantages, facilities, or accommodations of its website—provided that taking such steps would not impose an undue

burden on Blick or fundamentally alter the website." *Id.* Finally, in *Suvino v. Time Warner Cable, Inc.*, No. 16 CV 7046-LTS-BCM, 2017 WL 3834777 (S.D.N.Y. Aug. 31, 2017), Judge Swain held that Title III applies to the website of Time Warner Cable as a good or service of the physical stores through which Time Warner Cable offered its services. *Id.* at *2.

### 3.   Decisions From Other Circuit Courts

Outside the Second Circuit, the circuit courts of appeals are divided over whether the ADA's Title III protections extend to Internet websites.

The Third, Sixth, and Ninth Circuits have held that the term "public accommodations" "is limited to physical accommodations." *Peoples v. Discover Fin. Servs., Inc.*, 387 F. App'x 179, 183 (3d Cir. 2010); *see Weyer v. Twentieth Century Fox Film Corp.*, 198 F.3d 1104, 1114–15 (9th Cir. 2000); *Parker v. Metro. Life Ins. Co.*, 121 F.3d 1006, 1010–11 (6th Cir. 1997) ("As is evident by § 12187(7), a public accommodation is a physical place and this Court has previously so held."). Those circuits have generally relied on the ADA's enumeration of particular "public accommodations" covered by Title III as including, *inter alia*, inns and hotels, restaurants and bars, movie theaters, stadiums, stores, banks, barbershops, law offices, train stations, museums, parks, schools, day cares, and gymnasiums. 42 U.S.C. § 12181(7).[6] The reasoning of the Ninth

---

[6] Section 12181(7) provides in full:

> The following private entities are considered public accommodations for purposes of this subchapter, if the operations of such entities affect commerce—
>
> **(A)** an inn, hotel, motel, or other place of lodging, except for an establishment located within a building that contains not more than five rooms for rent or hire and that is actually occupied by the proprietor of such establishment as the residence of such proprietor;
>
> **(B)** a restaurant, bar, or other establishment serving food or drink;
>
> **(C)** a motion picture house, theater, concert hall, stadium, or other place of exhibition or entertainment;
>
> **(D)** an auditorium, convention center, lecture hall, or other place of public gathering;
>
> **(E)** a bakery, grocery store, clothing store, hardware store, shopping center, or other sales or rental establishment;

Circuit in *Weyer* is representative. "Places of public accommodation," the Ninth Circuit explained,

> are actual, physical places where goods or services are open to the public, and places where the public gets those goods or services. The principle of *noscitur a sociis* requires that the term, "place of public accommodation," be interpreted within the context of the accompanying words, and this context suggests that some connection between the good or service complained of and an actual physical place is required.

*Weyer*, 198 F.3d at 1114; *see also, e.g.*, *Young v. Facebook, Inc.*, 790 F. Supp. 2d 1110, 1115 (N.D. Cal. 2011).

The First and Seventh Circuits, in contrast, have read the ADA to extend to service providers, including websites, with or without a nexus to a physical place. Beginning with the First Circuit's decision in *Carparts Distribution Center, Inc. v. Automotive Wholesaler's Association of New England, Inc.*, 37 F.3d 12 (1st Cir. 1994), those courts have reasoned that the ADA extends to "providers of services which do not require a person to physically enter an actual physical structure." *Id.* at 19. Analyzing the list of "public accommodations" enumerated in § 12181(7), the First Circuit reasoned that, "[by] including 'travel service' among the list of services considered 'public accommodations,' Congress clearly contemplated that 'service

---

(**F**) a laundromat, dry-cleaner, bank, barber shop, beauty shop, travel service, shoe repair service, funeral parlor, gas station, office of an accountant or lawyer, pharmacy, insurance office, professional office of a health care provider, hospital, or other service establishment;
(**G**) a terminal, depot, or other station used for specified public transportation;
(**H**) a museum, library, gallery, or other place of public display or collection;
(**I**) a park, zoo, amusement park, or other place of recreation;
(**J**) a nursery, elementary, secondary, undergraduate, or postgraduate private school, or other place of education;
(**K**) a day care center, senior citizen center, homeless shelter, food bank, adoption agency, or other social service center establishment; and
(**L**) a gymnasium, health spa, bowling alley, golf course, or other place of exercise or recreation.
42 U.S.C. § 12181(7).

establishments'" would include service providers without "an actual physical structure." *Id.* A travel-service business, the court reasoned, routinely conducts business by phone or mail. "Likewise," the Circuit wrote, "one can easily imagine the existence of other service establishments conducting business by mail and phone without providing facilities for their customers to enter in order to utilize their services.  It would be irrational to conclude that persons who enter an office to purchase services are protected by the ADA, but persons who purchase the same services over the telephone or by mail are not.  Congress could not have intended such an absurd result." *Id.*

Relying on *Carparts*, the Seventh Circuit has reached the same conclusion, interpreting Title III's prohibition on discrimination as "plainly enough" applying to a facility "whether in physical space or in electronic space" "that is open to the public." *Doe v. Mut. of Omaha Ins. Co.*, 179 F.3d 557, 559 (7th Cir. 1999); *see also, e.g.*, *Morgan v. Joint Admin. Bd., Ret. Plan of Pillsbury Co. & Am. Fed'n of Grain Millers, AFL-CIO-CLC*, 268 F.3d 456, 459 (7th Cir. 2001) ("The site of the sale is irrelevant to Congress's goal of granting the disabled equal access to sellers of goods and services.  What matters is that the good or service be offered to the public.").

The Eleventh Circuit takes a middle position.  It holds that the ADA bars discrimination *outside* of a physical place of public accommodation (on the Internet or phone, for example), that nevertheless deprives an individual of the right to enjoy the goods or services offered to the public *at* the physical place of public accommodation.  *Rendon v. Valleycrest Prods., Ltd.*, 294 F.3d 1279, 1285 (11th Cir. 2002); *see also, e.g.*, *Gil v. Winn Dixie Stores, Inc.*, 242 F. Supp. 3d 1315, 1321 (S.D. Fla. 2017) (denying defendant's motion for judgment on the pleadings where plaintiff's Title III claim alleged that barriers to accessing website denied plaintiff equal access to services at defendant's brick-and-mortar stores).

13

### 4.   This Court's Assessment

As the above review suggests, whether ADA Title III applies to a commercial website presents two distinct questions of statutory construction, one broad, the other narrower. The broad question is whether such websites themselves qualify as electronic places of "public accommodation." If so, the ADA applies to them, and a denial to a blind person of equal access to such a website is actionable. Judge Weinstein and the First and Seventh Circuits, among others, have thus read the ADA. The narrower question is whether, even if commercial websites are not places of "public accommodation," the ADA is implicated when such a website operates in sufficiently close tandem with a conventional place of "public accommodation," like a merchant's brick-and-mortar store, that access barriers to the website serve as access barriers to that place of public accommodation. The Eleventh Circuit has held that the ADA may be violated in that fashion.

For the following reasons, this Court holds that the ADA affords a right to relief in either circumstance. A commercial website itself qualifies as a place of "public accommodation" to which Title III of the ADA affords a right of equal access. And, even if this were not so, the ADA separately is violated where failure to afford equal access to a website impairs the user's access to a traditional public accommodation, such as a merchant's brick-and-mortar stores.

This Court's construction of the statute begins with its plain language. *See, e.g.*, *United States v. Am. Soc'y of Composers, Authors, Publishers*, 627 F.3d 64, 72 (2d Cir. 2010). If the statute has "'a plain and unambiguous meaning with regard to the particular dispute in the case,'" then the Court's inquiry is at an end. *Id.* (quoting *Barnhart v. Sigmon Coal Co.*, 534 U.S. 438, 450 (2002)). But where the statute's text leaves its meaning ambiguous, the court may resort to other tools of statutory interpretation, including considering the statute's legislative history,

14

*Louis Vuitton Malletier S.A. v. LY USA, Inc.*, 676 F.3d 83, 108 (2d Cir. 2012), and its "broader

context and primary purpose," *Serv. Emps. Int'l, Inc. v. Dir., Office of Workers Comp.*

*Program*, 595 F.3d 447, 453 (2d Cir. 2010) (internal quotation and citation omitted).  In all

events, the Court's charter is to interpret the statute in "in a way that avoids absurd

results."  *Frank G. v. Bd. of Educ. of Hyde Park*, 459 F.3d 356, 368 (2d Cir. 2006) (internal

quotation and citation omitted).

The Court first considers the broader question of statutory coverage:  whether, under the

ADA, private commercial websites are places of "public accommodation."  As to that question,

Title III's text, viewed alone, does not yield a certain answer.  Section 12181(7) of the statute

defines numerous private entities as "public accommodations," provided that they affect

commerce.  *See note 6, supra.*  The listed entities include hotels and motels, restaurants, theaters,

museums, libraries, parks, zoos, and day care centers, but the statute is silent as to cyberspace.

That is, of course, because the ADA, enacted in 1990, preceded the popular adoption of the

World Wide Web and the advent of cyber commerce.

As to how Congress would have viewed cyber commerce, competing inferences can be

drawn from the statutory text, in particular, from the private entities that Section 12181(7) lists as

"places of public accommodation."  On the one hand, almost all of the listed entities take the

form of physical structures.  This has been cited to support the inference that only physical

places are subject to Title III's strictures.  As the Ninth Circuit has put the point: "The principle

of *noscitur a sociis* requires that the term, 'place of public accommodation,' be interpreted within

the context of the accompanying words, and this context suggests that some connection between

the good or service complained of and an actual physical place is required."  *Weyer*, 198 F.3d at

1114.

But that textual argument does not carry the day, for two reasons.  First, as the First and Seventh Circuits have noted, the text contains a counter-example suggesting Congress's intent to reach commercial service providers whether or not selling to customers in a defined physical space.  As the First Circuit recognized in *Carparts*, Section 12181(7) lists "travel service" among the services defined as "public accommodations," and travel services do not require the existence of a physical structure.  37 F.3d at 19; *see also Doe*, 179 F.3d at 559.  The Second Circuit emphasized this, too, in *Pallozzi* when it held that Title III applies to insurance underwriting services, which also can exist independent of a physical space.  198 F.3d at 32–33.  As the First and Seventh Circuits have reasoned, that Title III lists a "travel service" as a "public accommodation" undermines the argument that a cyberspace market, by virtue of its lack of a conventional physical presence, falls outside the statute's reach.  Second, subsection E of Section 12181(7) provides that "public accommodations" include "a bakery, grocery store, clothing store, hardware store, shopping center, *or other sales or rental establishment*."  42 U.S.C. § 12181(7) (emphasis added).  To be sure, the examples of "sales and rental establishments" given in subsection E are all brick-and-mortar enterprises, and the word "establishment" used in subsection E's broad residual clause ("other sales or rental establishment") in 1990 would likely have been understood to refer to a brick-and-mortar facility.  But, given Congress's intention that the ADA be read broadly in light of its remedial aims and that it be construed to keep pace with changing technology, *see infra*, at 17–20, the term "other sales or rental establishment" can be fairly read in today's world dominated by e-commerce to encompass a commercial website.  A finding that such websites are covered by Title III thus would have a textual basis in the statute.

The statutory text therefore—unsurprisingly in light of the ADA's pre-Internet vintage—does not cleanly resolve whether Title III applies to commercial websites.  Finding the statute

textually ambiguous on the point in question, the Court therefore turns to the statute's purpose, legislative history, and context.

These interpretive tools strongly support construing the term "public accommodation" to apply to commercial marketplaces, including on the Internet, whether or not these marketplaces take a conventional physical form. As the Supreme Court has repeatedly recognized, Congress's purpose in enacting the ADA was broad: "to remedy widespread discrimination against disabled individuals." *PGA Tour, Inc. v. Martin*, 532 U.S. 661, 674 (2001). Congress found that "physical or mental disabilities in no way diminish a person's right to fully participate in *all aspects of society*, yet many people with physical or mental disabilities have been precluded from doing so because of discrimination." 42 U.S.C. § 12101(a)(1) (emphasis added). Moreover, "Congress found that 'historically, society has tended to isolate and segregate individuals with disabilities, and, despite some improvements, such forms of discrimination against individuals with disabilities continue to be a serious and pervasive social problem.'" *PGA Tour*, 532 U.S. at 674–75 (quoting 42 U.S.C. § 12101(a)(2)). Congress identified many areas of society in which individuals with disabilities faced persistent discrimination, including "employment, housing, public accommodations, education, transportation, communication, recreation, institutionalization, health services, voting, and access to public services." 42 U.S.C. § 12101(a)(3). "After thoroughly investigating the problem, Congress concluded that there was a 'compelling need' for a 'clear and comprehensive national mandate' to eliminate discrimination against disabled individuals, and to integrate them 'into the economic and social mainstream of American life.'" *PGA Tour*, 532 U.S. at 675 (quoting S. Rep. No. 101–116, p. 20 (1989); H.R .Rep. No. 101–485, pt. 2, p. 50 (1990), USCCAN 1990, pt. 2, pp. 303, 332). To

remedy these ills, "Congress provided [a] broad mandate" in the ADA to effect the statute's "sweeping purpose." *Id.*

Congress's purposes in adopting the ADA would be frustrated were the term "public accommodation" given a narrow application, under which access to the vast world of Internet commerce would fall outside the statute's protection. Today, few areas are more integral to "the economic and social mainstream of American life," *PGA Tour*, 532 U.S. at 675, than the Internet's websites. As the Court recently held in holding the First Amendment's protections applicable to an Internet venue: "While in the past there may have been difficulty in identifying the most important places (in a spatial sense) for the exchange of views, today the answer is clear. It is cyberspace—the 'vast democratic forums of the Internet . . . .'" *Packingham v. North Carolina*, 137 S. Ct. 1730, 1735 (2017) (quoting *Reno v. Am. Civil Liberties Union,* 521 U.S. 844, 868 (1997))[7]; *see United States v. Peterson*, 248 F.3d 79, 83 (2d Cir. 2001) ("Computers and Internet access have become virtually indispensable in the modern world of communications and information gathering.").

The ADA's legislative history, too, supports this construction. It reflects Congress's expectation that the statute's broad language would adapt as technology and modes of access evolved. Most significantly, the House Committee Report stated,

> Indeed, the Committee intends that the types of accommodation and services provided to individuals with disabilities, under all of the titles of this bill, should keep pace with the rapidly changing technology of the times.

H.R. Rep. 101-485, 108, 1990 U.S.C.C.A.N. 303, 391; *see also Scribd*, 97 F. Supp. 3d at 574. Limiting Title III's scope to brick-and-mortar venues would be inconsistent with this intention.

---

[7] In holding in *Packingham* that First Amendment access rights applied to the Internet venue at issue, the Supreme Court, in fact, noted that a "place" may exist entirely on the Internet. 137 S. Ct. at 1735; *see also Reno*, 521 U.S. at 868.

Such a holding would "render [Title III] effectively impotent" in broad swaths of social and economic life, "which would be contrary to the broad remedial purpose of the ADA—an act that 'has been described as a milestone on the path to a more decent, tolerant, progressive society.'" *Mary Jo C. v. N.Y.S. & Local Ret. Sys.*, 707 F.3d 144, 160 (2d Cir. 2013) (quoting *Martin*, 532 U.S. at 675).

Finally, the ADA must be interpreted in the context of how expansive, remedial statutes like the ADA have historically been interpreted. It is a familiar tenet that Congress need not perpetually refresh and update legislation where a broad but textually fair construction achieves the statute's explicit aims. Such a statute is to "be broadly construed to effectuate its purpose of providing a clear and comprehensive national mandate for the elimination of discrimination against individuals with disabilities." *Mary Jo C.*, 707 F.3d at 160 (quoting *Noel v. N.Y.C. Taxi and Limousine Comm'n*, 687 F.3d 63, 68 (2d Cir. 2012)). And the ADA itself announces Congress's intent to "invoke the sweep of [its] authority, including the power to enforce the fourteenth amendment and to regulate commerce, in order to address the major areas of discrimination faced day-to-day by people with disabilities." 42 U.S.C. § 12101(b)(4).

The Court reads the ADA, like other broadly worded statutes, to "reflect[] an intentional effort to confer the flexibility necessary to forestall . . . obsolescence." *Massachusetts v. E.P.A.*, 549 U.S. 497, 532 (2007). "[T]he fact that a statute can be applied in situations not expressly anticipated by Congress . . . demonstrates [its] breadth." *Id.* (quoting *Pa. Dep't of Corr. v. Yeskey*, 524 U.S. 206, 212 (1998)); *see also, e.g.*, *Cablevision Sys. Corp. v. F.C.C.*, 649 F.3d 695, 707 (D.C. Cir. 2011) (rejecting argument that Congress's failure to include "terrestrial programmers" on a list of covered entities removed them from the FCC's jurisdiction because the statute's "expansive language suggest[ed] that [Congress] intended to give the Commission

sufficient flexibility 'to maintain . . . a grip on the dynamic aspects of [video programming]' so that it could pursue the statute's objectives as industry technology evolves." (quoting *United States v. Sw. Cable Co.*, 392 U.S. 157, 172 (1968))).

For these reasons, the Court holds that the term "public accommodation" in Title III extends to private commercial websites that affect interstate commerce. This construction, although not dictated by the ADA's text, is consistent with it; and it is compellingly supported by the ADA's purposes, legislative history, and context. By applying the ADA to today's ubiquitous world of e-commerce, this construction vindicates Congress's intent that the ADA remedy discrimination against the disabled in "all aspects of society."

Even if this construction did not hold, the ADA would still reach Bonobos' website here on the narrower theory adopted by some courts, including the Eleventh Circuit, under which the statute applies to a website that offers goods and services in tandem with a place of "public accommodation," including a brick-and-mortar store. The ADA's text unambiguously prohibits discrimination in the provision of the goods or services *of* a place of public accommodation. And Title III's core proscription, Section 12182, entitled "Prohibition of discrimination by public accommodations," underscores that the act bars discrimination more than just spatially within a physical structure. Instead, it sets out the following as Title III's "[g]eneral rule":

> No individual shall be discriminated against on the basis of disability in the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of any place of public accommodation by any person who owns, leases (or leases to), or operates a place of public accommodation.

42 U.S.C. § 12182(a). That proscription thus is not limited to discrimination on the basis of a disability *within* a place of public accommodation. It instead prohibits an owner or operator of such a place from discriminating in the provision of, *inter alia*, the "goods" or "services" *of* that place of public accommodation.

On this point, the district court's reasoning in *National Association of the Deaf v. Netflix, Inc.*, 869 F. Supp. 2d 196 (D. Mass. 2012), is persuasive.  Addressing an ADA claim based on allegedly unequal access for hearing-impaired persons to a video-streaming site, that court evaluated the ADA's definition of "public accommodation" in Section 12181(7) in concert with the anti-discrimination proscription of Section 12182(a).  The latter's ban on discrimination, the court reasoned, "covers the services 'of' a public accommodation, not services 'at' or 'in' a public accommodation.  This distinction is crucial." 869 F. Supp. at 201.[8]

Indeed, the Second Circuit's analysis in *Pallozzi* all but compels this same conclusion.  Considering the same statutory text, the Circuit there found persuasive that Congress had chosen to guarantee access to goods and services "*of* any place of public accommodation," rather than "*in*" such a place.  As the Circuit explained, "[t]he term 'of' generally does not mean 'in,' and there is no indication that Congress intended to employ the term in such an unorthodox manner in Section 302(a) of Title III." 198 F.3d at 33.  The Circuit further noted that "many of the private entities that Title III defines as 'public accommodations'—such as a 'bakery, grocery store, clothing store, hardware store, [or] shopping center,' as well as a 'travel service, . . . gas station, office of an accountant or lawyer, [or] pharmacy,' sell goods and services that are ordinarily used outside the premises." *Id.*  It would make little sense, the Circuit reasoned, to limit Title III's scope to discrimination in the provision of goods or services literally consumed *in* a place a of public accommodation.  *Id.*

---

[8] District courts in the Ninth Circuit have similarly read the statute.  *See Nat'l Fed'n of the Blind v. Target Corp.*, 452 F. Supp. 2d 946, 953 (N.D. Cal. 2006) ("The statute applies to the services *of* a place of public accommodation, not services *in* a place of public accommodation.  To limit the ADA to discrimination in the provision of services occurring on the premises of a public accommodation would contradict the plain language of the statute."); *Robles v. Dominos Pizza LLC*, No. CV1606599SJOSPX, 2017 WL 1330216, at *3 & n.1 (C.D. Cal. Mar. 20, 2017).

21

The facts alleged and cognizable here make this narrower theory of ADA liability, based on the nexus between a commercial website and the merchant's associated place of public accommodation, available to the visually impaired plaintiff, Del-Orden. It is undisputed that Bonobos.com is a service *of* Bonobos. And the FAC adequately alleges that the website operates in tandem with Bonobos' brick-and-mortar stores. *See* FAC ¶¶ 19, 24, 31–35. In particular, the FAC alleges that Bonobos.com features "a store locator, allowing persons who wish to shop at Bonobos to learn its location, hours of operation, and phone numbers." FAC ¶ 34(a). A review of the website confirms there is a direct and considerable link between Bonobos' website and the company's physical stores. The website includes a list of those brick-and-mortar stores—what Bonobos refers to as "Guideshops"—and information about the services available at the Guideshops. *See* Bonobos, It Starts With Fit. Start Here, https://bonobos.com/guideshop (last visited Dec. 18, 2017). What is more, on the webpage for each and every piece of clothing Bonobos.com offers for sale, an icon labeled "try it on" provides a link to the Guideshop page, which offers the customer the opportunity to try in person the piece of clothing he was considering on the website.[9]

Thus, as Bonobos has structured its business, the website directly refers Bonobos' customers to its real-world stores. Bonobos.com is therefore unquestionably a good, service, facility, or accommodation *of* a place of public accommodation, the Bonobos Guideshop stores, such that discriminatory access to the website for visually impaired customers, at least as alleged, would result in their lesser access to these stores.

---

[9] *See, e.g.*, Bonobos, Highland Golf Shorts, https://bonobos.com/products/highland-golf-shorts?color=blue%20minicheck (last visited Dec. 18, 2017); Bonobos, The Stretch Italian Wool Topcoat, https://bonobos.com/products/the-stretch-italian-wool-topcoat?color=camel (last visited Dec. 18, 2017).

Bonobos' counter-argument is primarily legal—it asserts that the statute does not apply, on either the broader or the narrower theory of ADA liability discussed above, to commerce on the Internet.  Bonobos does not argue that, if the broad theory is valid, that its website does not affect commerce, or, if the narrower theory is valid, that its website is insufficiently connected to its brick-and-mortar stores to support liability.   Instead, Bonobos argues that *Pallozzi* should be limited to discriminatory practices in the provision of insurance services, and should not be extended to other Internet commerce.  For the reasons above, this argument is unpersuasive. Nothing in *Pallozzi* limited the logic of its holding construing the term "public accommodation" to the provision of insurance, as opposed to other services.  Bonobos does not offer any good reason to so read the statute.

The Court, accordingly, holds that the ADA extends to Bonobos' website.  That is so both because the ADA, on this Court's construction, applies to private commercial websites as places of "public accommodation" and independently because Bonobos.com operates in tandem with, and as a point of access to, Bonobos' brick-and-mortar stores.

C.      **Does the FAC Allege Ongoing Violations of the ADA?**

Having held that Title III of the ADA applies to Bonobos.com, the Court addresses Bonobos' related contentions that the FAC nevertheless fails to state a claim, *see* Fed. R. Civ. P. 12(b)(6), and/or that any such claim has been rendered moot by modifications Bonobos has made to that website since Del-Orden initiated this lawsuit, *see* Fed. R. Civ. P. 12(b)(1).

To state a claim under Title III of the ADA, a plaintiff must allege that (1) he is disabled within the meaning of the ADA; (2) defendants own, lease, or operate a place of public accommodation; and (3) defendants discriminated against him by denying him a full and equal

opportunity to enjoy the services defendants provide. *Camarillo v. Carrols Corp.*, 518 F.3d 153, 156 (2d Cir. 2008); *see* 42 U.S.C. § 12182(a).

Bonobos accepts that Del-Orden is legally blind, and that that condition constitutes a disability within the meaning of the ADA.[10] But it argues that the modifications it has made to its website since the filing of Del-Orden's initial complaint have rectified the access barriers of which Del-Orden complains, and that Bonobos has "absolutely no incentive" to revert its website to its prior, allegedly unlawful state. Def. Br. at 12.

In this case, Bonobos' motion to dismiss, assessed under either Rule 12(b)(1) or Rule 12(b)(6), lacks merit for an identical reason: The FAC plausibly alleges that at least one extant access barrier remains to blind persons' effective use of the Bonobos.com website. As a result, whether the motion to dismiss is analyzed for an alleged failure to state a claim, or for alleged mootness, the motion must be denied, because the FAC thus states a live, justiciable ADA claim.

Specifically, the FAC acknowledges that Bonobos' modification of the website "added certain accessible features such as alternative text and navigation links." FAC ¶ 43. Nevertheless, the FAC alleges that Bonobos.com "is still not reasonably accessible." *Id.* Specifically, it alleges that "[b]lind customers are still unable to select the desired fit and type of clothes" and are "still being prevented from making purchases on Bonobos.com." *Id.* Del-Orden's response to Bonobos' motion to dismiss on grounds of mootness elaborates on this alleged deficiency. He alleges that "[o]n the webpage that displays the shopping cart, blind individuals are unable to scroll to complete order when zoom is on, which prevents blind customers from completing a transaction." Pl. Br. at 8.

---

[10]  The ADA defines disability as, *inter alia*, "a physical or mental impairment that substantially limits one or more major life activities of such individual." 42 U.S.C. § 12102 (1)(A). Bonobos does not contest that Del-Orden's legal blindness meets this definition. Def. Br. at 13.

The Court reviewed the Bonobos.com website—which all parties agree is cognizable on the motion to dismiss, *see supra*, notes 1 and 4—for the limited purpose of determining whether Del-Orden's claims of access impediments to the visually impaired are plausible.[11]   The Court's review confirms that the claim of at least some such impediments is plausible.   It reveals, for example, that, when zoomed in at 200%, the checkout button is almost entirely outside the visible screen; using the "Tab" key would not reveal the button in its entirety.   It is plausible that, for a visually impaired user seeking to purchase Bonobos clothing or an accessory but forced to access the website with a screen-reader, the off-screen nature of this necessary button might "deny[] him a full and equal opportunity to enjoy the services defendants provide," *Camarillo*, 518 F.3d at 156.

The Court's review of Bonobos.com also suggests that, at least in some places on the website, a user may be unable to activate the alt-text coded into the images on the site without highlighting those images with a cursor.   As Bonobos explains in its motion to dismiss, alt-text describes the "content of the images in text form," and allows the blind user to "navigate a website using the keys on their computer keyboard."   Def. Br. at 4.   To the extent alt-text can only be accessed by using the cursor, however, that alt-text may be rendered substantially less useful to a blind user, such that Bonobos.com may deny Del-Orden a full and equal opportunity to enjoy the services it provides.

To be sure, Bonobos counters that the first of these problems, involving zooming-in, is screen-dependent.   It represents, for example, that the checkout button is visible at 200% zoom

---

[11] Had the website been clearly inconsistent with Del-Orden's description of it, the website would have controlled.   *See, e.g., Orozco*, 2016 WL 5416510 at *5 (finding allegations in complaint to be implausible based on the Court's review of a website incorporated by reference into the complaint).

on a 23.8 inch display, *see* Def. R. Br. at 6; Dkt. 26 ¶¶ 9–10 (providing a picture), and "the amount of content that can be displayed in one screen for any particular web page magnified varies depending on the web browser used and the size of the computer monitor the page is being displayed on," Dkt. 26 ¶ 9. That defense, however, is properly tested in discovery and at summary judgment or trial. Whether the deficiencies alleged by Del-Orden exist or are sufficiently pervasive or consequential to establish an ADA violation are ultimately questions of fact. The Court's review of the website served to confirm that at least one claimed deficiency is plausibly claimed. It is beyond the scope of this Court's proper review at the motion to dismiss stage, or its expertise, to make the further functional determinations whether the allegedly problematic features of the Bonobos.com website do or do not, in practice, rise to the level of an ADA violation.

The competing audit reports submitted by the parties as accompaniments in support of their memoranda of law reinforce the conclusion that discovery is necessary to determine Bonobos.com's compliance with the ADA, or lack thereof. Bonobos has submitted two affidavits of Dominique Essig, the "Chief Experience Officer" of Bonobos, whose role includes "overseeing technical matters related to Bonobos' commercial website." Affidavit of Dominique Essig, Dkt. 23 ¶ 2 ("Essig Aff."); *see* Reply Affidavit of Dominique Essig, Dkt. 26 ("Essig Reply Aff"). In his initial affidavit, Essig attested that Bonobos.com can be accessed using a variety of screen-reading software. Essig Aff. at ¶ 5.

In response, Del-Orden submitted an unsworn "audit" conducted by ADASure, a digital consulting firm. *See* Pl. Br., Ex. A (the "ADASure Audit"). In a separate filing, Del-Orden submitted the Declaration of Michael McCaffrey, in which McCaffrey affirms that he was a member of the ADASure team retained by Del-Orden to audit Bonobos.com. *See* Declaration of

Michael McCaffrey, Dkt. 27.[12]  ADASure's audit purports to evaluate Bonobos.com as of July 29, 2017.  It concludes that Bonobos.com fails to comply with several guidelines for websites' accessibility for blind users.  *See* ADASure Audit at 2, 4.

As Bonobos rightly argues, Del-Orden has not yet established, at the level that would be required to support admissibility of ADASure Audit, the expertise of ADASure or the reliability of the methods it used.  Def. R. Br. at 2.  However, on the pleadings, the governing standard is not compliance with *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 590 (1993), or which party, on balance, has the stronger argument as to whether the Bonobos.com website complies with the ADA.  It is whether, considering all cognizable material, the FAC has plausibly pled a violation of law.  And here, the Court finds plausible Del-Orden's claim of unequal access to the Bonobos.com website, as corroborated by the colorable ADASure Audit.  There will be time later in this litigation to test the reliability and admissibility of the expert opinions sure to be rendered by each side on this point, and to assess the sufficiency of each side's evidence.

In light of the holding that at least one live access barrier has been plausibly pled, the Court has no occasion to consider the viability of Del-Orden's other claims of impediments to access.  Nor, given this holding, does the Court have occasion to consider whether—to the extent

---

[12] Although the McCaffrey Declaration was untimely, the Court, in its discretion, has considered it, for the limited purpose of helping to interpret the technical ADASure Audit.  The Court therefore denies defendant's motion to strike the McCaffrey Declaration.  Dkt. 28.

Bonobos has rectified earlier alleged access barriers to the website—there is any likelihood that Bonobos would reinstate such barriers.

### D.    Bonobos' Other Arguments

Bonobos makes two other arguments against permitting Del-Orden's lawsuit to move forward.  Neither is persuasive.

First, Bonobos argues that if the ADA does apply to Bonobos.com, it would violate due process for this Court to evaluate the website using the standards adopted in the Web Content Accessibility Guidelines 2.0 by an international working group, the International World Wide Web Consortium.  There is no occasion now to address this contention.  In sustaining the FAC, this Court has not applied such standards.  It will be for later in this litigation—perhaps at the point of summary judgment motions, perhaps in connection with a *Daubert* motion directed to potential expert testimony, or perhaps at another juncture—for the parties to brief the standards by which website accessibility to the visually impaired is to be measured.  The Court reserves judgment on this issue.

Second, Bonobos argues that this Court should abstain from adjudicating Del-Orden's claim because the Department of Justice, to which the ADA delegates rule-making authority, is considering regulations governing online accessibility standards.  Bonobos bases this argument on the "primary jurisdiction" doctrine, the aim of which is "to allocate initial decisionmaking responsibility between courts and agencies and to ensure that they 'do not work at cross-

purposes.'" *Ellis v. Tribune Television Co.*, 443 F.3d 71, 81 (2d Cir. 2006) (quoting *Fulton Cogeneration Assocs. v. Niagara Mohawk Power Corp.*, 84 F.3d 91, 97 (2d Cir. 1996)).

Courts in the Second Circuit generally apply four factors in determining whether abstention in deference to an agency's decisionmaking is prudent:

> (1) whether the question at issue is within the conventional experience of judges or whether it involves technical or policy considerations within the agency's particular field of expertise;
> (2) whether the question at issue is particularly within the agency's discretion;
> (3) whether there exists a substantial danger of inconsistent rulings; and
> (4) whether a prior application to the agency has been made.

*Schiller v. Tower Semiconductor Ltd.*, 449 F.3d 286, 295 (2d Cir. 2006).

To the extent Bonobos' argument seeks to dissuade the Court from deciding a question of statutory interpretation—*e.g.*, whether the ADA applies to commercial websites—there is no credible argument for abstention. As the Second Circuit has held, where an issue "does not involve technical or policy considerations within the agency's particular field of expertise but instead simply requires [the Court] to engage in an activity—statutory interpretation—that is the daily fare of federal judges," abstention is unwarranted. *Id.* Had the Justice Department issued regulations addressing the interpretive issues above, courts addressing such claims, including this court, would surely have considered those views, including any argument that deference was due to an agency's statutory construction. *See Chevron U.S.A., Inc. v. Natural Res. Defense Council, Inc.*, 467 U.S. 837 (1984). The Justice Department, however, has not rendered any such interpretation and there is no charter for this Court to defer doing its duty while waiting for one.

A separate question is presented by the potential guidance, including technical expertise, that the Department of Justice may one day render, by regulation, as to the standards by which a commercial website may comply with the ADA. If and when such standards issue, they likely will be consequential as to the standard for judging liability. *See, e.g., Bragdon v. Abbott*, 524

U.S. 624, 646 (1998) ("As the agency directed by Congress to issue implementing regulations, *see* 42 U.S.C. § 12186(b), to render technical assistance explaining the responsibilities of covered individuals and institutions, § 12206(c), and to enforce Title III in court, § 12188(b), the Department's views are entitled to deference.").  In applying the ADA in other contexts—for example, in cases presenting ADA questions relating to architectural barriers—courts have looked for guidance to the DOJ's ADA Accessibility Guidelines ("ADAAG").  *See, e.g., Rosa v. 600 Broadway Partners, LLC*, 175 F. Supp. 3d 191, 203 (S.D.N.Y. 2016) (denying summary judgment to defendant on ADA claim after analyzing defendant's sales counter's compliance with relevant ADAAG); *Disabled in Action of Metro. New York v. Trump Int'l Hotel & Tower*, No. 01 CIV. 5518 (MBM), 2003 WL 1751785, at *12 (S.D.N.Y. Apr. 2, 2003) (assessing defendant's compliance with ADAAG governing elevator access).  Once promulgated, the DOJ's regulations setting out standards for making a website accessible to the visually impaired, based as the Court expects they will be on technical expertise rendered by qualified professionals, will likely be similarly influential to courts considering ADA claims in this area.  *See Robles*, 2017 WL 1330216 at *7–8.

However, no such regulations have yet issued.  And Bonobos has not given the Court any reason to expect the issuance of such regulations anytime soon.  In 2010, the DOJ issued a notice of proposed rulemaking expressing its intent to address these issues.  *See* Nondiscrimination on the Basis of Disability; Accessibility of Web Information and Services of State and Local Government Entities and Public Accommodations, 75 Fed. Reg. 43,460 (proposed July 26, 2010)

(to be codified at 28 C.F.R. pts. 35 and 36).  But more than seven years have passed without any final regulation having issued, and this regulatory project is now listed as "inactive."[13]

Under these circumstances, the doctrine of primary jurisdiction does not counsel in favor of abstention.  It is unknown when, if at all, the DOJ will issue regulatory standards addressing the ADA's standards governing website access.  Open-ended abstention in favor of regulatory guidance that may never come would disserve the interest of Del-Orden, and the putative class he proposes to represent, in resolution of his ADA claim.  *See Andrews*, 2017 WL 3278898 at *16–17; *cf. Goya Foods, Inc. v. Tropicana Prod., Inc.*, 846 F.2d 848, 853–54 (2d Cir. 1988) (declining to apply doctrine of primary jurisdiction in trademark infringement dispute where "the interest in prompt adjudication far outweighs the value of having the views of" the United States Patent and Trademark Office).

And moving forward with this litigation does not compel the Court, today or imminently, to resolve the substantive standards for ADA liability in this area.  Today's ruling holds only that Del-Orden's FAC has stated an ADA claim.  This Court will not have occasion to consider or apply the substantive standards for ADA liability in this area until after discovery is complete and the factual record is closed, a process likely, on this Court's ordinary discovery schedule, to take four or more months.  The substantive standards governing potential ADA liability of websites to the visually impaired are not likely to come before this Court until they are presented by summary judgment, *Daubert*, and/or other pretrial motions, or in the context of a motion for class certification.  In the event that the DOJ by then has issued regulatory standards or indicated

---

[13] *See* Office of Information and Regulatory Affairs, Current 2017 Inactive Actions List, https://www.reginfo.gov/public/jsp/eAgenda/InactiveRINs_2017_Agenda_Update.pdf.

that such are forthcoming, Bonobos will be at liberty then to move anew for appropriate relief, including abstention.

## CONCLUSION

For the foregoing reasons, the Court denies Bonobos' motion to dismiss.  The Clerk of Court is respectfully directed to close the motions pending at Dkts. 21 and 28.  The Court hereby lifts the stay of discovery imposed by this Court's July 26, 2017 Order, Dkt. 20.  The parties are instructed to jointly submit a revised case management plan by Friday, December 29, 2017, which provides for the close of fact discovery by the end of April 2018 and the close of expert discovery by the end of May 2018.

SO ORDERED.

Paul A. Engelmayer
United States District Judge

Dated: December 20, 2017
       New York, New York